## 11026

COOPER & GRIFFIN, INC. v. W. C. COOKE & CO., INC.

(115 S. E., 312)

1. PLEADING—OBJECTIONS TO EVIDENCE BECAUSE ANSWER RAISES ONLY ISSUE OF LAW SHOULD BE OVERRULED.—If issues joined were questions of law, and plaintiff failed to demur to the answer as not stating facts constituting a defense, the rights of the parties were to be determined on the pleadings, and plaintiff could not object to evidence sustaining the answer.

2. EVIDENCE—PAROL TESTIMONY ADMITTED WHERE CONTRACT SUSCEPTIBLE OF MORE THAN ONE INFERENCE.—Where a contract is suscepti-

ble of more than one inference, parol testimony is admissible, and the inference must be drawn by the jury.

3. EVIDENCE—PAROL TESTIMONY EXPLAINING USE OF "LANDED" IN COTTON CONTRACT ADMISSIBLE.—"Landed," as used in cotton sale contracts, means delivery to buyer within certain zones, and in a cotton sale at 15½ cents landed, where the contract was incomplete because "landed" was not self-explanatory, parol testimony was admissible to explain its meaning, and inferences to be drawn therefrom were for the jury.

4. SALES—SELLER OF COTTON NOT PUT IN DEFAULT WHERE BUYER FAILED TO INSTRUCT AS TO PLACE OF DELIVERY.—Where seller of cotton was not required to deliver until notified by buyer where to ship, seller could not be put in default as to delivery until instructions were given by buyer.

Before McIVER, J., Spartanburg, 1922. Reversed and remanded.

Action by Cooper & Griffin, Inc., against W. C. Cooke & Co., Inc. Directed verdict for plaintiff and defendant appeals.

*Messrs. Evans & Galbraith,* for appellant, cite: *Construction of language of contract by the parties should be given great weight:* 81 S. C., 12; 54 S. C., 765.

*Messrs. Haynesworth & Haynesworth,* and *L. W. Perrin,* for respondent, cite: *Exceptions too general:* 83 S. C., 200; 110 S. C., 278. *Where terms of contract are understood not necessary that it be reduced to writing even though it was agreed that it would be:* 175 N. Y., 480; 135 S. W., 988; 278 Fed., 19. *Informal writing binding even though it stipulate for a formal contract which was not drawn:* 255 Fed., 187; 253 Fed., 929; 224 Fed., 859; 236 Fed., 536. *Oral agreements merged in writing:* 278 Fed., 863; 96 U. S., 544.

October 9, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

This is an action for an alleged breach of contract involving the sale of 60 bales of cotton. The complaint, omitting paragraphs I and II, which merely allege the corporate existence of the parties, is as follows:

"III. That on May 12, 1919, the plaintiff entered into an agreement with the defendant, whereby the defendant agreed to sell to the plaintiff 60 bales of cotton of the grade hereinafter specified at the price of 15½ cents landed, and that the defendant entered into a written memorandum, signed by it, of which the following is a copy: (Same as Exhibit I.)

"IV. That according to the Carolina Mill Rules it is provided that cotton sold for prompt shipment must be shipped and B/L dated fourteen (14) days from the date of sale.

"V. That actual delivery of said cotton was intended and contemplated by both parties to said contract.

"VI. That the defendant did not ship the said cotton within the time provided by the contract and said rules, but the plaintiff did not insist upon strict compliance with the stipulations as to shipment and that, the defendant having failed to make shipment, the plaintiff on May 30th wrote a letter to the defendant, calling upon defendant to comply with its contract; that to this letter no reply was made, and the plaintiff, on June 16th, again wrote to the defendant, calling upon it to comply with its contract, and advising the defendant that unless it delivered the cotton the plaintiff within 10 days would buy other cotton for its account, charging the difference against the defendant; that the defendant failed and neglected to make shipment of said cotton, and that the plaintiff on June 26th purchased of A. C. Walker, a cotton merchant of the city of Greenville, 60 bales of cotton of the grade which the defendant had contracted to deliver, at the price of 23 cents per pound charging the difference, to wit, $2,016, against the defendant.

"VII. That after the contract entered into between the plaintiff and the defendant, the price of cotton advanced, and the plaintiff has been damaged by the defendant's breach of contract in the sum of $2,016.

"Wherefore plaintiff prays judgment against the defendant for the sum of $2,016 and the costs of this action."

The defendant by its answer denied the allegations of the complaint, and set up two defenses, but it is only necessary to state the first, which is as follows:

"That it denies specifically each and every allegation contained in the complaint, and requires strict proof thereof.

"II. As a defense to said action, defendant alleges: (1) That on or about the 12th day of May, A. D. 1919, the plaintiff contracted to purchase 60 bales of cotton, grade 'blue, equal types' 20 bales of which were in warehouse at Laurel Hill, in the State of North Carolina, and 40 bales of which were stored at Gibson, in the State of North Carolina; (2) that on or about the 12th day of May, A. D. 1919, defendants agreed to sell said cotton to the plaintiffs, notifying them where the same was stored, plaintiffs agreeing to send a man immediately to Laurel Hill and Gibson, in the State of North Carolina, and take up the cotton without further effort or concern of the defendants, but said plaintiffs failed and refused to take up said cotton as they had agreed, and by reason thereof the said cotton was sold to other parties, and, if any damage was suffered by the plaintiffs, as set forth in the complaint, it was through their own negligence and willful failure and refusal to take up the cotton as they had agreed and not through any fault of the defendants."

His Honor, the presiding Judge, thus charged the jury:

"I agree with counsel in this much of what they have said, that there is nothing here for you to have to pass on. The whole thing is practically a question of law. I do not conceive that there are really any facts in dispute which are legally raised by the issues by the complaint, on the one

hand, and the answer on the other. The complaint sets out in terms and in full, an alleged contract which they understood to prove, and which was not disputed. Therefore I can say to you that that was the contract proved before you. Now the law makes the Judge the exclusive Judge of the construction of a contract when it is in writing, or any document that is in writing is exclusively for the Judge. As I say, the plaintiff sets up and has offered testimony to prove what was the contract between the parties, and he sets that contract out in his complaint. Now the defendant comes in and denies that contract. Well, he would have a perfect right to do that, but in his testimony, he admits it. He admits that he signed it. Therefore that goes out of the case. Then he undertakes to set up what is practically a different verbal contract, varying to some extent the contract which is set out in the complaint, and which the defendant admits that he signed, varying it in certain particulars. Well, the law is just this: That where parties enter into an agreement in writing, and then finally put that agreement in writing, that writing comprehends the whole agreement between the parties, and no testimony is admissible to change, vary or modify that contract. The law says that, when parties meet together and contract, or whether they meet or not, and negotiate about a contract, and then finally get together and put it in writing, that writing is the whole thing, and that writing cannot be disturbed unless the party attacking it alleges that it was done by mistake or by fraud, or unless he alleges that, even though that contract was made, there was a subsequent contract that changed it. Well, there are no allegations to that extent in this answer at all, absolutely none. Consequently we can go merely by the contract that is set up in writing and that has been proved, and that contract which it is my duty to construe provides, in terms, that W. C. Cooke & Co. agreed to sell, and did sell in this contract, which they confirm, to the agent of the plaintiffs, Cooper & Griffin, Inc., 60 bales

of cotton, that they did that on the 12th day of May, and that that cotton was to be blues equal types. They have explained to you, as they had a right to do under that feature of the contract, what is meant by blues equal types; that the price was to be 15½ cents per pound, and that the cotton was to be landed. I allowed testimony to show what 'landed' meant, and that meant, the witnesses testified without dispute—no conflict of testimony there—that that meant that the cotton was to be practically, as it were, delivered; in other words, the seller was to pay the freight, provided it was shipped within a reasonable distance where freights would not be excessive. The rules further provided that the shipment was to be prompt, and that the shipment was to be made with draft and bill of lading attached, and that the shipment was to be made under the Carolina Mill Rules of 1915. Well, I charge you that that means and can mean nothing more than that they agreed to ship it subject to these rules, and they agreed to ship under these rules to wherever they were notified to ship it within reasonable distance, and that under the rules prompt shipment meant that they might ship it any time within 14 days, but it meant that they should ship it, and they would ship it, paying the freight to the point of shipment, which under this contract I charge you to be Spartanburg, with draft and bill of lading attached. Now, that being the undisputed testimony, and I having ruled out all the testimony offered and proposed to contradict or vary or change the terms of that written contract, it naturally follows that there is nothing to do but to confirm that contract."

The jury accordingly rendered a verdict in favor of the plaintiffs for the amount demanded in the complaint.

Exhibit 1 is as follows:

"Spartanburg, S. C., May 12, 1919.

"Mr. E. P. Murray, Manager, Spartanburg, S. C.: We confirm selling as follows: Account of W. C. Cooke & Co. To Cooper & Griffin. Date, May 12th, 1919. No. B—C

60 (sixty bales cotton). Graded, blues equal types. Price 15½ c. (fifteen and half cents) landed. Shipment prompt. Reimbursement: Draft B—L, attached. Terms: Carolina Mill Rules of 1915, Remarks: ———. Please sign duplicate and return. Very truly yours, W. C. Cooke & Co., Inc., by W. C. Cooke, President-Treasurer.

"Accepted:———

"Date: ———.

"Should there be any discrepancy in this contract, please notify us immediately by telephone or wire; otherwise, it will be accepted as correct."

Carolina Mill Rules are as follows:

## "Contracts

"All sales made by shippers direct or through brokers to Mills, either by telegraph, telephone or verbally, must be confirmed in writing by both parties to the contract without delay.

## Shipment

"(a) Cotton sold for prompt shipment must be shipped and bills of lading dated within fourteen days from date of sale, for immediate shipment within seven days.

"(b) When a sale is made for shipment in a certain month, cotton may be shipped at any time that shipper may elect during the month specified, but shipment must be made and bills of lading dated within the month specified. If for delivery at shipper's option, cotton may be delivered at any time during the month, but must be delivered within the month specified.

. "(c) When the time of 'shipment' or 'delivery' specified in the contract has expired, and the cotton contracted for has not been 'shipped' or 'delivered,' the contract shall be closed for the portion in default, and settlement immediately made at the difference between the price of sale and the price at which cotton of equal quality may be secured for immediate shipment to the place of delivery as specified in the

contract, and the seller shall pay in addition one-fourth cent per pound penalty for default, provided, however, that when, owing to congestion of traffic, the shipper is unable to have cotton loaded or delivered within the contract time, and shall furnish buyer a duplicate bill of lading showing the cotton is in possession of the transportation company, or furnish other satisfactory evidence that the cotton is ready for shipment, the contract for this portion of the cotton shall be extended for 20 days and shall not lapse nor penalty apply until the expiration of these 20 days. When contracts are closed in this manner the weights per bale shall be taken at 500 pounds.

"(d) All bills of lading accompanying drafts must show the loading of the cotton, i. e., the initials and numbers of the cars and the numbers of bales therein, and the weights shown on bills of lading must agree with the invoice weight."

Exhibit 5 is as follows:

"Greenville, S. C., June 26, 1919.

"Mr. A. C. Walker, Greenville, S. C.—Dear Sir: We beg to confirm the following purchase from you: Date: June 26th, 1919. Quantity: Sixty (60) bales. Quality: Type 'M. M.' Price: Twenty-three (23) cents per pound. Terms: 1915 Mill Rules, Landed Greenville, S. C. Shipment: Prompt. Reimbursement: Draft 3 days sight B–L attached, on us through People's National Bank, Greenville, S. C. Documents to us here. Remarks: ———. Yours truly, Cooper & Griffen, Inc., by Wade Cothran, Treas.

"Accepted: A. C. Walker.

"Date: June 26, 1919."

W. C. Cooke, witness for the defendant, was sworn and testified as follows:

"I am living in Spartanburg; have been in business here thirteen years. W. C. Cooke & Co. is a chartered institution. I am president, W. D. Burnett, vice president, J. S. Burnett, treasurer. Offices in Spartanburg; business, cotton merchants. We warehouse cotton, buy and sell it. In

1919 I sold Cooper & Griffin 60 bales of cotton, grade blues, equal type. We offered in writing to sell them so much cotton. I delivered to them as offered, according to their instructions, at Laurel Hill and Gibson. They instructed me to deliver it to those points. They did nothing towards receiving the cotton there, and never took it up. They were informed that the cotton was there by me. I informed Mr. E. P. Murray, the manager of Cooper & Griffen office here in Spartanburg. This transaction was had here in Spartanburg, between E. P. Murray, manager· of Cooper & Griffin office, and myself. They had an office here at that time. The whole matter was between these two offices."

D. D. Little, called as a witness for the defendant, was sworn and testified as follows:

"Reside in Spartanburg. Cotton brokering and manufacturing business. Broker and cotton merchant. Have been in business 40 years. I have had experience with contracts and contracts for sale and delivery of cotton among brokers and merchants and factories.

"Q. I shall ask you to read Exhibit 1. Will you tell us what that word 'landed' means among the cotton trade?

"Mr. Haynesworth: Just to save time, I would like to make my objection again that the expression is plain.

"The Court: Objection overruled.

"Mr. Evans: Tell the jury what the word 'landed' means there, and imports. A. Gentlemen, the common phraseology that I understand to be used quite frequently in the mill business, I will buy cotton and say 'landed,' I don't know just what mill I am going to send that to at the time that I am buying it. I may ·buy 500 bales; I don't know whether I want to send 100 to this mill or 200 to that one, and one to the other, and so on. So I say 'landed,' and give my shipping instructions later, and the word 'landed' means anywhere in that zone. For instance, if I buy cotton in Atlanta, I would· say 'landed in group B or group A or group C.' That means anywhere where the freight is not

excessive from the point mentioned or talked about.   I would say, 'Landed at Gaffney,' why, anywhere in group B that cotton would go, so the freight wasn't excessive over the Gaffney rate.

"Q. What connection has that word there with instruc- tions?   What does it import as to further instructions?   A. That instructions will be given later; that I couldn't give the instructions at the time, and that I would give them to you in a day or two; I will give them to you later.   We quite frequently buy cotton and say, 'Instructions will be given later.'

"Q. You said something about shipping instructions be- ing given later.   What do you mean by that?   A. Shipping instructions by the purchaser."

Cross-examination by Mr. Haynesworth: .

"Q. Mr. Little, as I understand you, 'price fifteen and one-half cents landed,' that means that the seller pays the freight to the destination, that destination being within a reasonable distance?   That is what the word means in that connection?   A. It means that the fellow pays the freight, but that is natural that he pays the freight.   It means landed at the point of destination.

"Mr. Evans:   And he pays the freight to that point, if it is not in that zone? .

"The Witness:   If it is not excessive."

Major John D. Frost, called as a witness for the defen- dant, was sworn and testified as follows:

"I live in Spartanburg; have been engaged in cotton busi- ness for 27 years, handling it in all of its phases.   I am familiar with those kinds of contracts.   (Witness shown paper.)   We would call this a confirmation of sale. 'Landed' in cotton parlance means that there are two ways of purchasing.   If he purchased f. o. b. at a certain loca- tion, wherever it is brought or purchased at the destination. The usual word to express that is 'landed'; that is, if I were to buy one hundred bales of cotton from you, I would

state in there that it was landed; that is that the seller pays the freight to the destination, wherever it is, and therefore, even if it is not stipulated in there, unless it is stated to the contrary, it would usually mean landed in the contract so the shipper pays the freight. *This has no destination in it; that is, this memorandum of sale here.* (Italics added.)

"Q. Now, what does that word import as to the delivery?

"Mr. Haynesworth: He has already given that.

"The Court: That is going too far. That would be his idea of the construction of the contract. All I can let him do is to explain ambiguities."

OPINION

The main question in the case is whether there was error on the part of his Honor, the presiding Judge, in his ruling that there was no issue of fact to be determined by the jury, but that the sole question was of law. If he was correct in this ruling, then it was incumbent on the plaintiffs to demur to the defenses set up in the answer, on the ground that they did not state facts sufficient to constitute a defense. Having failed to demur to the defenses, the rights of the parties were to be determined under the pleadings as they stood at the time of the trial. Therefore the plaintiffs did not have the right to object to the introduction of testimony for the purpose of sustaining the allegations of the answer. It is not necessary, however, to rest our conclusion on this ground, as there are others that are more substantial.

While it is unquestionably true that the construction of a written instrument, ordinarily, is a question to be determined by the Judge, and not by the jury, nevertheless that rule is not applicable when the writing is incomplete, or its provisions susceptible of more than one inference. In such cases parol testimony is admissible, and the inference must be drawn by the jury, under proper instructions from the presiding Judge. The contract in ques-

tion, which is set forth in Exhibit 1, shows upon its face, that it was incomplete by reason of the fact that the word "landed" is not self-explanatory, and that it was necessary to resort to other testimony to explain its meaning. The presiding Judge properly allowed the introduction of such testimony, but erred in refusing to submit it to the jury, and likewise in directing a verdict for the plaintiffs. In this case we have an illustration of an incomplete contract in Exhibit 1, and of a complete contract in Exhibit 5. The plaintiffs were parties to both contracts, and Exhibit 5 shows that they knew that Exhibit 1 was incomplete, and also what was necessary to make it complete. We thus have their construction of the two contracts—that one was incomplete and the other complete. The defendants were not required to deliver the cotton until they were notified by the plaintiffs where it was to be delivered. One reason why this notice was necessary was because the defendants could not know how to carry out their part of the contract until they were notified as to the destination of the cotton. In this respect it was the duty of the plaintiffs to become the actors. Another reason was because the freight charges constituted an element of the contract inasmuch as the plaintiff had the option of selecting the place of delivery, but upon the condition that the freight charges were reasonable, and the reasonableness of such charges could not be known to the defendants, until the plaintiffs notified them of the intended destination. It cannot be successfully contended that the defendants were at fault until this information was given them.

These conclusions are sustained by the following authorities:

"At the trial, defendant sought to show, that while no reference is made in the contract as to freight, that it was agreed at the time of the contract that the merchandise should be delivered at Lancaster, S. C., without any charge for freight against the defendant. Steady and serious con-

tention was carried on in the effort to introduce testimony on this issue, but the circuit Judge held that it was not competent for the defendant to enlarge the written contract; and further held, that where a contract is silent in regard to the freight charges on merchandise shipped from one point to another, to wit, from the place of the seller to the place of the buyer, that the law holds that the delivery is at the place of the seller, and consequently all costs for 'freight between the two points is to be paid by the buyer. * * * We think, however, that it was competent for the defendant, as purchaser, to rebut the presumption that he was to pay the freight, and to show by parol testimony that the plaintiff agreed to do so. The written agreement was silent on this subject, and such testimony would not alter or vary the contract as reduced to writing—21 A. & E. Ency. Law, 1094. Of course, the plaintiff should be allowed to introduce testimony on this subject in reply." *Buist Co. v. Lancaster Co.,* 68 S. C., 523, 47 S. E., 978; *Chemical Co. v. Moore,* 61 S. C., 166, 39 S. E., 346.

In volume 1 of Starkie on Evidence it is said:

"It has been frequently doubted whether a particular question be one of law or of fact. Thus far it is clear that, whenever upon particular facts found the Court by the implication of any rules of law can pronounce on their legal effect, with reference to the allegations on the record, such inferences are matters of law. It is also clear that, whenever the Court cannot pronounce on the legal effect of particular facts and whenever it is requisite to enable them to do so, that the jury should find some other inferences or conclusions, such further inferences as questions of fact."

After quoting the foregoing language, this Court in the case of *Glover v. Gasque,* 67 S. C., 18, 45 S. E., 113, proceeds as follows:

"It is unquestionably the duty of the Court, in construing a written instrument, to interpret its language, and it may also state the effect thereof, where it is susceptible of

but one inference; but where the inference to be drawn from the facts stated in the instrument is in dispute and such facts susceptible of more than one inference, then the question must be determined by the jury, especially when the inference to be drawn is dependent upon other facts in the case."

"Courts, in the construction of contracts, look to the language employed, the subject matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described." *Nash v. Towne*, 5 Wall., 689, 18 L. Ed., 527.

"Where there is a doubt as to the proper meaning of the contract, the Court may receive evidence of the practical construction which the parties themselves have placed on it, as indicated by their acts under it, for it is a canon in the interpretation of contracts, that the practice of the parties under them, may furnish a solid basis on which their construction may rest, insomuch as the subsequent acts of the parties in executing a contract, may reflect their intention in making it." 21 A. & E. Ency. of Law, 1115.

"Doubtless the general rule is that it is the province of the Court to construe written instruments; but it is equally well settled that, where the effect of the instrument depends not merely on its construction and meaning but upon collateral facts and extrinsic circumstances, the inferences of fact to be drawn from the paper must be left to the jury." *West v. Smith*, 101 U. S., 263, 25 L. Ed., 809.

"When the parties to a contract have given it a particular construction, such construction will generally be adopted by the Court, in giving effect to its provisions. And the subsequent acts of the parties, showing the construction they have put upon the agreement themselves, are to be

looked to, by the Court, and in some cases may be controll-
ing." 9 Cyc., 588, 589.

"The construction of a contract is a question for the
Court, if the terms of the contract and the extrinsic facts
which may effect construction, are free from dispute. This
rule applies where the contract consists of several writings,
as where it consists of letters exchanged between the parties.
* * * If the terms of the contract are in dispute, or it is
possible to draw more than one inference from the estab-
lished facts, which are relied on to show the intention of the
parties, the jury must determine such facts, or decide which
of such inferences is the correct one. The Court should
in such cases submit the question of fact to the jury, under
proper alternative instructions, as to the construction to be
given in the event of each possible finding of fact by the
jury." 2 Paige on Contracts, § 1129.

"It is a well-settled principle that when the construction
to be given a contract is rendered doubtful by the language
thereof, the interpretation of the contract by the parties
themselves, is entitled to great weight." *Williamson v.
Eastern Building & Loan Association,* 54 S. C., 582, 32
S. E., 765, 71 Am. St. Rep., 816, affirmed by the U. S.
Supreme Court in 189 U. S., 122, 23 Sup. Ct., 527, 47 L.
Ed., 735.

The foregoing principles have been sustained by this
Court in the following cases: *Glover v. Gasque,* 67 S. C.,
18, 45 S. E., 113; *Holliday v. Pegram,* 89 S. C., 73, 71 S.
E., 367, Ann. Cas., 1913A, 33; *Watson v. Paschall,* 93 S.
C., 537, 77 S. E., 291.

Reversed and remanded for a new trial.

Mr. Justices Marion and Fraser concur.

Mr. Justice Cothran (dissenting): Action for $2,016
damages alleged to have been sustained by the plaintiff, a
corporation, by reason of the breach of a contract by the
defendant, also a corporation, for the sale of 60 bales of
cotton from the defendant to the plaintiff.

The following facts are not in dispute: On May 12, 1919, the defendant delivered to the plaintiff a memorandum in writing confirming the sale by it to plaintiff of 60 bales of cotton of a certain grade at 15½ cents per pound "landed"; the shipment was to be "prompt," and the terms, "Carolina Mill Rules of 1915." The defendant did business in Spartanburg; the plaintiff had a branch office of its Greenville business at Spartanburg; and the memorandum was addressed to E. P. Murray, the plaintiff's manager at Spartanburg.

The Carolina Mill Rules referred to provide that cotton sold for "prompt" shipment must be shipped and bills of lading dated within 14 days from .date of sale, and, when. the time of shipment specified in the contract has expired, and the cotton contracted for has not been shipped, settlement shall be made upon the market differences, plus one-fourth of a cent per pound as a penalty.

The cotton not having been delivered, the plaintiff wrote to the defendant on May 20, 1919, four days after the expiration of the delivery dated under said Rules, calling attention to the contract of May 12, 1919, expressing its willingness to receive the cotton at any time and requesting immediate delivery through its manager at Spartanburg, Mr. Murray. In this letter the plaintiff declared its interpretation of the contract to be a delivery at Gibson, N. C.

The defendant having made no reply to this letter of May 30th, the plaintiff again wrote the defendant on June 16th, stating that no reply had been received, and notifying the defendant that unless the cotton was delivered to it within 10 days it would "buy same in for your account, billing you with the difference in cost." On June 17th, defendant acknowledged receipt of the letter of 16th, stating that Mr. Cooke, who handled such matters, was out of the city, and that upon his return early the following week he would take up the matter.

On June 23 the plaintiff wrote the defendant, referring to the promise contained in the letter of 17th, and notifying the defendant that, if nothing was heard from it by the 26th, the plaintiff would buy in the 60 bales and bill the defendant for the difference in cost. Not hearing from the defendant within the limited time, the plaintiff went upon the market on June 26th, and purchased from A. C. Walker, a cotton merchant in Greenville, 60 bales at 23 cents per pound, and drew upon the defendant for the difference in cost $2,016, which draft the defendant declined to pay. For some reason, unexplained, this draft was not made until July 11th.

On June 28th, the defendant replied to the plaintiff's letter of the 23d, disclaiming all fault in the nondelivery of the cotton, for the reason that it was understood, when the cotton was sold, that it was to be taken up at one, and that the plaintiff had promised to send a man for that purpose; that the failure of the plaintiff to send a man caused Pate, the man from whom the defendant had contracted to buy the cotton to sell to another party; the defendant saying (quoting from said letter):

"We certainly feel that after selling you the cotton, it was clearly up to you to receive the cotton as we instructed you, and furthermore, had you permitted us to ship the cotton and guarantee weights and grade without some one taking up the lot, this would never have occurred"

The defendant's defense, set forth in its answer, is as outlined in the letter last referred to, and is in effect this: That at the time of making the contract of sale, and as a part of it, the defendant had on hand 20 bales in a warehouse at Laurel Hill, N. C., and 40 bales at Gibson, N. C.; that the plaintiff was notified of that fact; that the plaintiff agreed to send a man immediately to those points and take up the cotton, relieving the defendant of all further efforts or concern in the matter; that the plaintiff failed to comply with that engagement, and that, by reason thereof,

the said cotton was sold to other parties; and that, if the plaintiff sustained any damage, it was due to its failure to take up the cotton as had been agreed.

As a matter of fact, the evidence shows that the defendant did not have the cotton at the places stated, and at the time of the contract of sale with the plaintiff. The cotton was then in the warehouse, and had been only contracted for by the defendant with the owner J. V. Pate; that contract matured on May 13th, but had not been paid for, the defendant evidently expecting to pay for it out of the proceeds of sale to the plaintiff.

As a matter of fact, it appears from the testimony of the defendant's manager, who made the contract with the plaintiff, that the alleged agreement on the part of the plaintiff to take up the cotton at the North Carolina points was made after the contract of same had been completed, and of course could not have entered, as alleged by the defendant, into the original contract as a part of it.

The presiding Judge ruled out all testimony relating to the agreement referred to, and directed a verdict in favor of the plaintiff for the sum sued for, $2,016. From the judgment entered upon the verdict, the defendant has appealed.

There was much testimony in the case as to the meaning of the alleged ambiguous word "landed," which appears in the written memorandum of the contract: "15½ cents per pound landed." In my opinion the case does not at all involve the meaning of that word. In the first place, I see absolutely nothing ambiguous about it. The contract was made in Spartanburg; the plaintiff's place of business was there; and the contract upon its face meant that the defendant was to deliver the cotton at Spartanburg free of all freight charge. The cotton was presumed either to be in Spartanburg, or to be delivered there without cost to the buyer. If it had been elsewhere, and the seller had proposed to bill the buyer with the cost of transportation to

the delivery point, the contract would have read "f. o. b." at the point where the cotton actually was.

But it is suggested the word in the trade means that shipping directions would have been given by the buyer to the seller before any obligation on his part arose. Assume this to be true, the defendant made absolutely no complaint upon this ground, but from the very first planted his defense upon the ground that the plaintiff had agreed to take up the cotton immediately at the North Carolina points, and that, having failed to call for it as agreed, he (the seller) was released from all obligations under his contract.

The truth of the matter is that the seller was operating upon a "hand to mouth" system, and, having failed to meet its contract with Pate by reason of the failure of the plaintiff to call for the cotton, and Pate having sold the cotton to others upon the failure of the defendant to comply, it claims absolution from its contract with the plaintiff. It was incumbent upon the defendant to comply with its contract with Pate and have the cotton ready for delivery under the contract with the plaintiff. The trouble is that cotton was rapidly advancing; in the short period of from May 12th to June 26th it advanced from 15½ cents to 23 cents, and the defendant must present a better excuse for not complying than he has done to induce my concurrence in its absolution. As cotton was advancing Pate was not at all indulgent to the defendant in the extension of its contract with him, which was perfectly natural, and closed out one of them on May 24th, two days before the naturity date of the plaintiff's contract with the defendant.

The Circuit Judge was entirely right in excluding evidence of the agreement alleged to have been made by the plaintiff to take up the cotton immediately. In the first place, the agreement is alleged in the answer to have been a part of the original contract. The defendant's manager shows explicitly that it was not; that it was made after the contract was concluded, either on the afternoon of the

12th or the morning of the 13th; and if it had been a part of the original agreement it would have been in conflict with the written memorandum, and evidence of it, in contravention of the accepted rule. In the second place, if such an agreement had been made after the contract was executed, no such defense was set up in the answer; on the contrary, it is alleged to have been a part of the original trade. In addition to this, the plaintiff wrote the defendant on May 30th:

"Since that time we have acted entirely in accordance with your instructions in our efforts to receive this cotton but so far without success."

It is strange, if the defendant's present position was not an afterthought, that no reply to this statement was made by the defendant until June 28th, after the cotton to cover had been brought by the plaintiff, and even then no controversion of the plaintiff's statement. Besides, on May 30th, in this same letter, the plaintiff wrote to the defendant expressing its willingness to receive the cotton and requesting prompt delivery. This was four days after the maturity date of the contract had expired.

I do not think that in any view of the case the plaintiff was responsible for the defendant's disappointment in its trade with Pate, or that the defendant has shown the slightest justification for failing to comply with the contract sued upon, and think that the direction of a verdict was entirely right.