20098

Frank FARR, Respondent, v. DUKE POWER COMPANY, Appellant
(218 S. E. (2d) 431)

*Messrs. Watkins, Vandiver, Kirven, Long & Gable,* of Anderson, *for Appellant,* cite:

*Messrs. Anderson, Kenyon & Epps,* of Anderson, *for Respondent,* cite:

*Messrs. Watkins, Vandiver, Kirven, Long & Gable,* of Anderson, *for Appellant, in Reply.*

September 25, 1975.

*Per Curiam:*

In this action the plaintiff-respondent, Farr, alleged breach of a contract by which appellant, Duke, purchased from Farr and others a water system located in Chateau Woods Subdivision near Anderson, South Carolina. Farr apparently succeeded to the rights of all others interested in the subdivision and the water system, as he was the sole plaintiff. Duke appeals from a verdict and judgment against it for actual damages in the sum of $13,404.40.

In October, 1968, Chateau Woods was a subdivision containing some 70 vacant lots most, if not all of which, were owned by Farr. Farr and associates had under construction a water system at a cost of $26,848.50. On October 25, 1968 such system was sold to Duke. The consideration for such purchase, included, *inter alia,* the following:

"For each service connection directly connected to said water mains as above described, to be laid by the Power Company, including connections made by the Owners named

above for the property now owned by them, the Power Company, will repay to the Owners $291.20. Said repayment will, be made during the term of five years, beginning on the date of the completion of said water mains but shall not be made after the sum of $26,848.50 has been repaid to the owners, nor after the expiration of said five-year period."

Obviously Farr contemplated that most of the lots in the subdivision would have dwellings erected thereon within the five year period mentioned in the contract, but due to numerous circumstances, by March, 1973, only six homes had been completed and two more commenced. Farr realized that he could not complete the subdivision before 1976 and accordingly, on March 22, 1973, wrote to Duke requesting that it extend for an additional three years "the period of time in which Duke makes payment to me for each water service connection." In lieu of such extension, he requested that Duke make service connections to each vacant lot upon which Farr agreed to pay the regular $75.00 tap-on fee, plus minimum monthly water bills, for each of the lots, until such time as a home was built on each lot. Duke did not see fit to grant the extension or agree to Farr's alternative proposal. On October 23, 1973, two days prior to the expiration of the five year term, specified in the contract, Farr wrote Duke demanding, as a matter of right, that each vacant lot in the subdivision be service connected and that he be paid the full cost of the water system. His demand not being complied with, this suit was instituted.

The prayer of the complaint was for actual damages in the amount of $26,848.50, the total cost of the water system. On trial the judge reduced the prayer of the complaint to $13,404.40, the amount returned by the jury. Such was arrived at on the basis of $291.20 for each vacant lot in the subdivision less, however, $75.00 per lot tap-on fee. The result of the verdict and judgment is that, in addition to the money judgment, the tap-on fee of each of the lots has been paid in advance. Stated otherwise, by the judgment below

Duke will have fully paid for the water system, the maximum contingent amount under the terms of its contract, although only eight houses had been constructed or started in the subdivision within the five year period of time.

Although several questions are argued we conclude that the appellant, Duke, was entitled to a directed verdict, or after verdict, to a judgment *n. o. v.*, and such makes the discussion of any other questions unnecessary. It is, of course, elementary that in considering whether a directed verdict should have been granted the evidence and all the inferences reasonably deducible therefrom have to be viewed in the light most favorable to the respondent, Farr. The parties argue at length as to the meaning of the technical term "service connection" used in the contract and the evidence thereabout. But, as we view the matter there is little, if any, conflict in the material evidence on this point. The term, generally, and as used in the contract obviously refers to a connection to the water mains, whereby a consumer obtains water, which normally, in a subdivision, takes place when a home is either constructed or at least under construction. As shown by the evidence, however, a service connection may be made, if one be so minded and is willing to pay therefor, to a vacant lot.

The question in this case is not what is the meaning of "service connection", but is, whether Farr, as he now contends, had the right under the contract to demand service connections to vacant lots and thereby be paid for his water system regardless of whether any water was sold, or about to be sold by Duke through such connections. The water system was, of course, valuable to Farr, the developer, as such enhanced the value and saleability of the lots in the subdivision, but it was of no value whatever to Duke in the absence of consuming customers. Duke was willing to pay, in effect toward the construction cost of the water system the sum of $291.20 for each water consuming customer. Duke immediately took over the maintenance of the water system and it was, of course, reasonable that some time limi-

tation be placed upon the development of the subdivision, the production by Farr of water customers and the payment to Farr for the water system. Duke paid within the five year period, in accordance with the contract, for each service connection actually made in the subdivision.

We find no ambiguity in the contract, the intent of the parties, we think, being entirely clear. Whether a contract is ambiguous is to be determined from the entire contract and not from isolated portions of the contract. *Bolt v. Ligon,* 144 S. C. 218, 142 S. E. 504. A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one. *Carolina Ceramics, Inc. v. Carolina Pipeline Co.,* 251 S. C. 151, 161 S. E. (2d) 179 (1968); *Bruce v. Blalock,* 241 S. C. 155, 127 S. E. (2d) 439 (1962); *Cooper & Griffin, Inc. v. W. C. Cooke & Co., Inc.,* 122 S. C. 314, 115 S. E. 312 (1922). Common sense and good faith are the leading touchstones of the inquiry. Where a construction of a contract makes it unusual or extraordinary and another construction, equally consistent with the language employed, would make it reasonable, fair, and just, the latter construction must prevail. An interpretation which evolves the more reasonable and probable contract should be adopted, and a construction leading to an absurd result should be avoided. *Sanders v. General Motors Acceptance Corporation,* 180 S. C. 138, 185 S. E. 180; *Charleston & Western Carolina Ry. Co. v. Joyce,* 231 S. C. 493, 99 S. E. (2d) 187.

The contract clearly shows that the parties contemplated that Farr was being given an opportunity to recover, in substantial part, the cost of the water system on an installment basis. The installments were due whenever a new service connection was made until either five years had elapsed or Farr had received $26,848.50. whichever came first. In order to place Duke in breach Farr demanded, two days prior to the contract's expiration, that Duke connect connect the system to 62 vacant lots and to

pay $291.20 for each of these connections. If Farr had the right to demand connections to vacant lots at that late date he, of course, had the right to demand such connections the day after the agreement was entered. Such would have resulted in Duke immediately paying for a water system in Farr's subdivision which might never be developed with any paying customers to Duke. Such an intended result is unreasonable and illogical when viewed in light of the five year limitation on the installment payments, which would be rendered entirely meaningless by Farr's presently urged construction.

The construction which Farr would now place upon the contract shifts the entire risk of loss (whether the lots will be sold and built upon) to Duke Power Company, which has no control whatever thereof. The only reasonable construction of this contract is that Farr was to be paid as the development progressed, with the sale of lots, and the building of homes with water consuming customers. The parties foresaw that the entire project would be completed within five years. That it was not does not entitle Farr to shift his loss to Duke.

In conclusion, we point out that Farr's letter to Duke of March 22, 1973, rather clearly shows that he did not then place upon the contract the unreasonable construction which he adopted in the letter written two days before the expiration of the five year period. Indeed, he testified on trial that in requesting the three year extension in which he would collect the installment payments he "hoped to build 15 or 20 houses during that additional three year period and recover some of (his) investment in the water line." The practical interpretation of the contract by the parties to it for any considerable period of time before it becomes the subject of controversy is entitled to great, if not controlling, influence. *Stackhouse v. Pure Oil Co.,* 176 S. C. 318, 180 S. E. 188 (1935); *Kitchens v. Lee,* 221 S. C. 59, 69 S. E. (2d) 67 (1952). The record rather clearly shows that Farr's construction of the contract was the same as Duke's

for nearly five years after the execution of the contract. The contract is simply not reasonably susceptible of the strained, illogical construction which, in this lawsuit, Farr belatedly endeavors to place thereupon.

The judgment below is reversed and the cause remanded for entry of judgment in favor of appellant.